IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

HERITAGE DISPOSAL & )
STORAGE, L.L.C., )
)
Plaintiff, )
)
v. )   Civil Action No. 1:15-cv-1484 (AJT/MSN)
)
VSE CORPORATION, )
)
Defendant. )
_____ )

## MEMORANDUM OF DECISION

In this diversity breach of contract case, Plaintiff Heritage Disposal and Storage, L.L.C. ("plaintiff" or "Heritage") seeks recovery under various legal theories for the storage of commercial grade fireworks. Heritage was hired for that purpose by Defendant VSE Corporation ("defendant" or "VSE"), which was contractually obligated to the Bureau of Alcohol, Tobacco and Firearms ("ATF") to provide that storage after ATF had seized those fireworks. The case was tried before a jury on June 27-30, 2016. On June 30, 2016, the jury returned a verdict in favor of plaintiff and against defendant on plaintiff's claims for *quantum meruit* (Count II) and unjust enrichment (Count III) and awarded damages in the amount of $4,782,265 on each claim [Doc. No. 138].[1]

---

[1] Before submitting the case to the jury, the Court granted VSE's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 as to Heritage's breach of contract claim (Count I) and denied the motion as to Heritage's *quantum meruit* (Count II) and unjust enrichment (Count III) claims. It also denied Heritage's Rule 50 motion as to VSE's affirmative defenses of accord and satisfaction and unclean hands. VSE withdrew its affirmative defense of duress, which the Court, in any event, found insufficient as a matter of law. The parties agreed that the *quantum meruit* claim was to be adjudicated by the Court; and the Court reserved on whether Heritage was entitled to a jury on its unjust enrichment claims. The Court submitted both claims to the jury. The parties agree that the damages the jury awarded to Heritage for its *quantum meruit* and unjust enrichment claims are completely duplicative.

Pending for adjudication by the Court, with the parties' agreement, are VSE's affirmative defenses based on (1) accord and satisfaction; (2) unclean hands; and (3) the statute of limitations. The parties are also in agreement that Heritage's claim for *quantum meruit* is to be decided by the Court and that the jury's verdict on that claim is advisory. The parties disagree, however, over whether plaintiff had a right to a jury on its unjust enrichment claim; and the Court must therefore decide whether the jury's verdict on that claim is binding or advisory under Federal Rule of Civil Procedure 39 and if advisory, decide that claim together with the *quantum meruit* claim. Finally, the Court must decide whether Heritage is entitled to any prejudgment interest on any judgment that is ultimately entered in its favor and if so, as of what date.

As discussed below, based on the evidence presented,[2] the Court finds and concludes that (1) the Settlement Agreement was effectively cancelled and rescinded after ATF decided not to award a work order either to VSE or Heritage for the destruction of the seized fireworks that Heritage was storing; and there was, accordingly, no accord and satisfaction that barred Heritage's claims; (2) Heritage had a right to a jury trial on its claim for unjust enrichment under the Seventh Amendment and the jury's verdict on that claim is therefore binding on the Court; and (3) Heritage is not barred from recovery under the doctrine of unclean hands. The Court finds and concludes, however, that Heritage's claims are time-barred with respect to the period before November 26, 2011, and the awarded damages are accordingly reduced from $4,782,265 to $3,496,086.29. The Court also concludes that Heritage is not entitled to prejudgment interest because Heritage's claims were for an unliquidated debt that was subject to a good faith dispute.[3]

---

[2] Following the jury's verdict on June 30, 2016, the Court continued the trial as a bench trial on those issues to be decided by the Court; and neither party presented any additional evidence during that phase of the trial. However, on November 8, 2016, VSE filed a Motion for Leave to File Supplemental Post-Trial Briefing and Evidence [Doc. No. 150]. The Court held a hearing for that motion on November 18, 2016 and then took it under advisement. By separate order, the Court has denied that motion.

[3] Based on this ruling, interest will accrue as of the date of entry of judgment at the judgment interest rate of 6% per annum pursuant to Va. Code Ann. § 8.01-382. *See also id.* § 6.2-302.

As to Heritage's *quantum meruit* claim, the Court renders its verdict in favor of Heritage, but only for the period after November 26, 2011, and awards damages, without any prejudgment interest, in the amount of $3,496,086.29, the amount Heritage invoiced to VSE for that period, less payments made.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[4]

### A.    Findings of Fact

1.  In 2007, the Bureau of Alcohol, Tobacco, Firearms, and Explosive ("ATF") seized hundreds of thousands of pounds of illegal fireworks from a location near Covington, Kentucky, a seizure that came to be known as the "the Covington Seizure."

2.  VSE had entered into a prime contract with the United States Department of the Treasury, which covered the storage and manipulation of the Covington Seizure (the "Treasury Contract"). The Treasury Contract was a "cost-plus" contract that allowed VSE to pass through the cost of storage to the Treasury Department, together with an additional fee.

3.  In order to provide the storage services required under the Treasury Contract, VSE entered into a subcontract with Heritage with respect to the Covington Seizure.

4.  The Covington Seizure required highly specialized care, with unique handling requirements caused by the magnitude and volatility of those fireworks.

5.  A typical warehouse was not suitable for the Covington Seizure, which required a special facility, security, and 24-hour surveillance to ensure its safety.

6.  Heritage maintained a state-of-the-art facility to safeguard and destroy fireworks under its care and custody. The facility provided separate bunkers for storage with an electronic

---

[4] Unless indicated otherwise, the statements of fact and legal conclusions stated throughout the Memorandum of Decision are also included in the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

security system, a secure fenced perimeter, and 24-hour armed security guards. The property is approximately 880 acres with no public access.

7. VSE was able to locate only one other suitable facility for the storage of the Covington Seizure, whose storage fees were nearly twice those of Heritage.

8. When Heritage first took possession of the Covington Seizure in 2007, the fireworks and their packaging were not weighed. Rather, under ATF supervision, the weight of the fireworks was estimated based on the weight listed on some of the boxes of fireworks and the weight attributed to unmarked boxes of fireworks based on the weight listed on boxes judged to be comparable in weight to the unmarked boxes.

9. Heritage and ATF both participated in the process of determining the weight of the fireworks at the time Heritage took possession; and based on that process, the total weight of the fireworks was calculated to be approximately 872,000 pounds.

10. ATF approved, authorized, and directed Heritage to bill for the storage of 872,000 pounds of fireworks.

11. Once placed within Heritage's storage facilities, ATF's consent was required for any access to or manipulation of the Covington Seizure.

12. Heritage initially billed for its storage service pursuant to a purchase order that had been issued to it and which expired on September 30, 2010 (the "Purchase Order").

13. On May 9, 2009, ATF directed VSE to "re-palletize the fireworks [being stored at Heritage] due to safety concerns." Pl.'s Ex. 3, at 3. The reconfiguration required more storage space to be utilized; and Heritage increased its storage billing rate under the Purchase Order from $0.10 per pound to $ 0.195 per pound in light of the additional space allocated to the

fireworks.  Based on that increased rate, Heritage billed VSE $170,000 per month for storage.

14. The Treasury Contract and Heritage's Purchase Order both expired on September 30, 2010. On September 24, 2010, ATF awarded VSE a replacement prime contract for the period beginning October 1, 2010, which also covered the storage and manipulation of the Covington Seizure (the "ATF Contract").  The ATF Contract, however, did not authorize payment for storage on a cost-plus basis, as the Treasury Contract, but rather provided for payment at specified rates for various categories of items stored; and ATF took the position that the Covington Seizure fell within a category whose storage rate was substantially below Heritage's storage fees under the expired Treasury Contract and Purchase Order.

15. The ATF Contract was negotiated and issued without Heritage's involvement, knowledge, or consent as to its rate structure.

16. With the knowledge, consent, and at the direction, of VSE and ATF, Heritage continued to provide storage and manipulation services for the Covington Seizure after the expiration of the Treasury Contract and the issuance of ATF Contract.

17. VSE and Heritage were never able to agree to a new subcontract with respect to the ATF Contract after the expiration of the Treasury Contract and the Purchase Order.  In that regard, VSE refused to continue the storage payments to Heritage at the same level as under the Treasury Contract; and Heritage did not agree to accept as full payment the amount that VSE was paying on a monthly basis. As a result, there was a dispute between the parties concerning the amount that Heritage should be paid for storage for the period beginning October 1, 2010 through August 2015, when all of the Covington Seizure had been transferred out of Heritage's facilities.

18. Notwithstanding their dispute over the price of storage, Heritage initially continued to invoice VSE as it did under the Purchase Order. In that regard, it initially billed VSE $170,000 per month, calculated at the rate of $0.195 per pound, for the months of October-December 2010. VSE paid Heritage's October and November 2010 invoices, but then, beginning for the period December 1, 2010, paid $92,394 per month.

19. After VSE refused to continue paying $170,000, Heritage changed its billing rate from a per pound rate of $0.195 per pound to a square foot storage rate of $12.19; and beginning in February 2011, for the monthly period ending January 31, 2011, Heritage billed $206,000 per month for storage services based on its square foot storage rate of $12.19, rather than $170,000 per month at the rate of $0.195 per pound. It also billed that per square foot charge retroactively to the period beginning October 1, 2010. As a result, for the period beginning October 1, 2010, and continuing through September 2012, when a volume of fireworks were transferred out of Heritage's storage facilities, Heritage billed $206,000 per month; and VSE paid $92,394 per month (except for November and December 2010, for which it paid $170,000 per month).

20. In September 2012, approximately 272,000 pounds of fireworks were transferred out of Heritage's facilities, reducing the original estimated weight from approximately 872,000 pounds to approximately 600,000 pounds.

21. Following the September 2012 transfer of fireworks, for the period beginning October 1, 2012, Heritage billed $125,069 per month (rather than $206,000), calculated based on $12.19 per square foot of space allocated to the fireworks remaining in storage. VSE paid $60,534 per month through August 2013, and then $57,348 per month through February 2015.

22. Beginning in March 2015 and continuing into August 2015, the remaining fireworks were removed from Heritage's facility and Heritage reduced its billings, and VSE, its payments, accordingly.  When actually weighed, the fireworks removed from March to August 2015 (that is, the fireworks that remained in Heritage's facilities after the September 2012 transfer) weighed less than a total of 385,000 pounds, rather than the approximately 600,000 pounds that remained from the original estimate of 872,000 after the September 2012 transfer of fireworks out of Heritage's facilities.

23. There is no industry standard or consistent billing method within the fireworks storage industry for storing the type of fireworks that constituted the Covington Seizure.

24. The rate charged by the only other vendor VSE could identify that was capable of storing the Covington Seizure in accordance with the requirements set forth in ATF Contract charged a rate of over $24 per square foot, a rate nearly 100% higher than the $12.19 per square foot rate billed to VSE by Heritage.

25. VSE did not object to Heritage's monthly bills except on the grounds that under the ATF contract, VSE could not recover the full amount of what Heritage had been charging because it had negotiated (without Heritage's involvement or agreement) a price for storage that did not cover what Heritage had been billing, and VSE had been paying, for over 3 years.

26. On October 24, 2013, the parties entered into a settlement agreement with respect to their dispute (the "Settlement Agreement").  Under the Settlement Agreement:

    a.  Heritage accepted as full payment for its storage services the payments that VSE had made. *See* Settlement Agreement, ¶ 1.

    b.  Subject to Heritage's right of rescission, Heritage released VSE "for any amount (cost, fee, otherwise), in addition [to] the amounts already paid" to Heritage.  Settlement

Agreement, ¶ 8; *see id.* ¶ 1 ("[Heritage] releases VSE and waives any and all claims for storage, and related costs, subject to paragraph 2 . . . .").

c.  The parties agreed that "[i]n the event the Covington seizure destruction Order is issued to a subcontractor other than [Heritage], then [Heritage] shall have the right to rescind this agreement in its entirety." Settlement Agreement, ¶ 2.

d.  The parties also agreed that:

> This Agreement is subject to ATF providing VSE with the destruction order to VSE based on mutually agreed pricing and terms and conditions between VSE and ATF. VSE and [Heritage] agree to cooperate in good faith to facilitate ATF accepting [Heritage] as the destruction vendor pursuant to VSE's prime contract with ATF for the Covington seizure. If ATF approves such destruction order to VSE based on [Heritage] carrying out the destruction, VSE and [Heritage] will enter into the necessary subcontract and purchase order that shall reference this Agreement and adopt its key terms and conditions.

Settlement Agreement, ¶ 11.

e.  VSE had an affirmative obligation to negotiate a contract with ATF for the destruction work based on the price that had been negotiated between Heritage and VSE for that work. *See* Settlement Agreement, ¶ 2.

27.  At the time the parties entered into the Settlement Agreement, they had the expectation that ATF would hire VSE to destroy the Covington Seizure, and VSE would, in turn, hire Heritage for that work. *See, e.g.*, Settlement Agreement, Recitals at 1 ("**Whereas**, ATF is expected to issue VSE a destruction order for fireworks being stored by [Heritage].").

28.  The parties intended that Heritage had the right to rescind the Settlement Agreement if it did not receive a subcontract for the destruction work that the parties anticipated would be awarded to VSE and that Heritage's release of VSE was conditioned on Heritage's receiving that work.

29. As part of ATF's selection process for that destruction work, ATF requested that Heritage demonstrate to ATF the efficacy of its proposed destruction method.  Heritage estimated that the requested demonstration would cost more than $100,000 and requested that ATF pay for it.  ATF declined to pay for the demonstration and Heritage declined to perform it.

30. ATF's Statement of Work with respect to its award of the fireworks destruction work specified that the fireworks be destroyed by using a rotary kiln, a method different than that proposed by Heritage.

31. Rather than destroying all of the Covington Seizure remaining at Heritage's facilities after the September 2012 transfer, ATF decided to transfer a substantial portion of those fireworks to the China Lake Naval Air Weapons Station in California to be used in military testing activities.

32. The ATF awarded General Dynamics the contract for the destruction of those fireworks not used at China Lake.  General Dynamics performed the destruction work itself (as opposed to subcontracting the work) using a rotary kiln.  As a result, neither VSE nor Heritage was retained for any part of the destruction work.

33. On November 26, 2014, the parties entered into a tolling agreement through March 1, 2015 (the "Tolling Agreement").  In the Tolling Agreement, the parties recited that the Settlement Agreement "was made subject to a destruction order for the Covington seizure being issued to Heritage, and which may be rescinded by Heritage if such a destruction order is not issued to Heritage."  Def.'s Ex. 191.

34. On January 14, 2015, after Heritage learned that ATF had decided not to award the destruction work to VSE or to Heritage, Heritage notified VSE that it was rescinding the Settlement Agreement.

35. On February 27, 2015, Heritage filed this action against VSE.[5]

36. No later than the end of 2010, VSE was on reasonable notice that the parties had not reached an agreement concerning price and that Heritage expected to be paid an amount greater than what VSE was paying; and with that knowledge, VSE continued to request and accept Heritage's storage services despite the lack of agreement as to price.

37. Heritage had a reasonable expectation of payment beyond that provided by VSE on a monthly basis, either by way of its monthly billings or through the revenue it would receive from the anticipated destruction work order.

38. Heritage rendered valuable services to VSE for storage of the Covington Seizure for the period January 1, 2011 through August 2015, VSE requested and accepted those services, and Heritage provided those service under such circumstances that VSE was reasonably notified that Heritage, in performing those service, expected to be paid by VSE beyond what VSE had, in fact, paid.

39. The reasonable value of Heritage's storage services is that amount invoiced to VSE based on $12.19 per square foot of storage space allocated to the Covington Seizure.

40. The damages awarded by the jury constitute the aggregate difference between the amount VSE had paid and the amount Heritage had billed since the period beginning October 1, 2010.

### B.      Conclusions of Law

1. The Court has jurisdiction to adjudicate this action and the claims and defenses asserted herein.

---

[5] Heritage originally filed this action in the United States District Court for the District of Nebraska, which transferred the action to this District on November 9, 2015 [Doc. No.27].

2. There was no accord and satisfaction that precluded Heritage from recovery under either its *quantum meruit* or unjust enrichment claim.

    a. Heritage had the right to rescind the Settlement Agreement in the event that it did not receive a work order for the destruction of the Covington Seizure.

        i. VSE has asserted the affirmative defense of "accord and satisfaction" based on Heritage's release of VSE under the Settlement Agreement for all claims for unpaid storage service through January 2014 and the absence of any occurrences that allowed Heritage to exercise any right of rescission under the Settlement Agreement, specifically ATF's failure to award the destruction work contract to VSE or a "subcontractor other than Heritage."

        ii. Under Virginia law, which governs the interpretation and construction of the Settlement Agreement, when the terms of a contract are clear and unambiguous, a court is required to construe the terms according to the plain meaning. *Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*, 463 S.E.2d 661, 664 (Va. 1995). As the Supreme Court of Virginia has reiterated many times:

> The guiding light is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares. Thus, if the intent of the parties can be determined from the language they employ in their contract, parol evidence respecting their intent is inadmissible. An ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time.

*Golding v. Floyd*, 539 S.E.2d 735, 737 (Va. 2001) (internal quotation marks, citations, and alterations omitted); *see also Schuiling v. Harris*, 747 S.E.2d 833, 836 (Va. 2013) ("We construe the contract as a whole, giving terms their ordinary meaning unless some other meaning is apparent from the context. The various

provisions are harmonized, giving effect to each when reasonably possible, and are construed considering the circumstances under which they were executed and the condition of the parties.").

iii.   Based on the language and structure of the Settlement Agreement, considered as a whole, the parties unambiguously intended that Heritage could withdraw from the agreement in the event that Heritage did not receive an order for the destruction work. The Settlement Agreement unambiguously expresses the parties' expectation that ATF would issue to VSE a work order for the destruction of the Covington Seizure and VSE would, in turn, enter into a subcontract with Heritage for that work. *See* Settlement Agreement, Recitals, at 1 ("**Whereas**, ATF is expected to issue VSE a destruction order for fireworks being stored by [Heritage]."). Under the Settlement Agreement, VSE had an affirmative obligation to negotiate a contract with ATF for the destruction work based on the price that had been negotiated between Heritage and VSE for that work, *see* Settlement Agreement, ¶ 2; and the Settlement Agreement expresses the parties' expectation that Heritage would receive a contract for the destruction work in exchange for its release of VSE. The parties also agreed that Heritage had the right to rescind the Settlement Agreement if it did not receive a subcontract for the destruction work that the parties anticipated would be awarded to VSE and that Heritage's release of VSE was conditioned on Heritage receiving that work. *See* Settlement Agreement, ¶ 1 ("[Heritage] releases VSE and waives any and all claims for storage, and related costs, subject to paragraph 2 . . . ."); *id.* ¶ 2 ("In the event the Covington seizure destruction Order is issued to a subcontractor other than

12

[Heritage], then [Heritage] shall have the right to rescind this agreement in its entirety.").

iv.   Although paragraph 2 does not explicitly state that Heritage's right of rescission is triggered in the event that VSE does not receive the destruction work order, the parties clearly expressed that intent and understanding in paragraph 11, which made the Settlement Agreement "subject to ATF providing VSE with the destruction order to VSE based on mutually agreed pricing and terms and conditions between VSE and ATF." Under Virginia law, the parties' agreement to make the Settlement Agreement "subject to" VSE's receiving the destruction work order from ATF conditioned the enforceability of the Settlement Agreement on the happening of that event. *See Golding*, 539 S.E.2d at 738, and cases cited therein.[6] The net result of these mutually dependent contractual undertakings and agreements is that Heritage had the right to undo the Settlement Agreement if it did not receive the destruction work order, either because ATF did not provide the destruction work to VSE or because VSE, having received the destruction work from ATF, did not enter into a subcontract with Heritage for that work. For these reasons, after construing the Settlement Agreement as a whole and giving its terms their ordinary meaning, the Court concludes that the parties' intent is clear and unambiguous: Heritage's retention for the destruction work was a condition to Heritage's being bound by the Settlement Agreement.

v.   Alternatively, were the Court to conclude that the Settlement Agreement is ambiguous as to the parties' intent, the Court finds from the parol evidence that the parties intended that Heritage's retention for the destruction work was a condition to Heritage's being bound by the Settlement Agreement. In that regard, the Court finds

---

[6] VSE argues that paragraph 11 was included solely for VSE's benefit. The Court finds no support for that position.

that the parties understood that Heritage was giving up its claims in exchange for the future destruction work, in the absence of which its claims could be revived. For example, VSE testified at trial, through the deposition of its designated corporate representative, that the concept underlying the Settlement Agreement was that Heritage would "let the historical dispute [over the storage costs] go if it got the destruction order," then estimated to be worth approximately $3 million. Tr. at 170. The parties' intent and understanding was further reflected in the Tolling Agreement dated November 26, 2014, which recited that the Settlement Agreement "was made subject to a destruction order for the Covington seizure being issued to Heritage, and which may be rescinded by Heritage if such a destruction order is not issued to Heritage." Def.'s Ex. 191.

b. Heritage effectively rescinded the Settlement Agreement.

i. Heritage provided clear and unequivocal notice of rescission. Heritage's January 14, 2015 rescission letter unequivocally states that "Heritage hereby exercises its right to rescind the Settlement Agreement in its entirety, in accordance with paragraph 2 of the Settlement Agreement and other applicable law. The Settlement Agreement is hereby rescinded." Pl.'s Ex. 32. In support of its position that Heritage fatally equivocated by attempting to affirm aspects of the Settlement Agreement in order to retain benefits under it, VSE points to Heritage's statement in its rescission letter that "[b]y participating in the manipulation and preparation of any portion of the Covington materials for movement to another storage facility, Heritage does not intend to waive, release, or otherwise alter its rights under the Settlement Agreement or any related contract." But any reasonable and fair reading of Heritage's notice of

rescission confirms that it "convey[ed] an unquestionable purpose to insist on cancelation" of the Settlement Agreement. *State Farm Mut. Auto. Ins. Co. v. Pederson*, 41 S.E.2d 64, 67 (Va. 1947). Heritage's relied upon statement, read within the context of the circumstances under which it was made, simply makes clear that it was, in fact, *not* waiving its right to rescind the Settlement Agreement because it had agreed to transfer the fireworks or receive payment for its necessary efforts in transferring the fireworks to another facility.

ii. Heritage did not retain or receive benefits under the Settlement Agreement such that the effectiveness of its rescission was vitiated. VSE first points to the three months of storage fees that VSE paid in advance under the Settlement Agreement, but, as VSE's Chief Financial Officer testified, those advances had been effectively recaptured, or "caught up," when VSE withheld certain payments to Heritage in 2014, long before the January 14, 2015 rescission letter. Tr. at 603. VSE next points to VSE's continuing efforts to advocate on Heritage's behalf for additional work; but there is no evidence that Heritage claimed that VSE had a continuing obligation to advocate on its behalf after its rescission; and with Heritage's storage claims revived, VSE understandably would have seen its own best interests advanced through the conduct it now relies on to challenge Heritage's rescission of the Settlement Agreement. In any event, under Virginia law, rescission does not require restoration that is "[a]bsolute and literal," but rather that which is "reasonably possible and demanded by the equities of the case." *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1057 (E.D. Va. 1987) (alteration in original) (quoting *Edmunds v. Chandler*, 127 S.E.2d 73, 78 (Va. 1962)). Here, the Court finds and concludes that restoration of the *status quo*

*ante* was effected to the extent "reasonably possible and demanded by the equities of the case."

iii.   The prevention doctrine did not preclude Heritage from exercising its right of rescission. Under the prevention doctrine, a contractual party waives or excuses the nonoccurrence of a condition if it "prevents or hinders fulfillment of [the] condition." *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000). "It requires that the conduct [] 'contributed materially' to the non-occurrence of the condition." *Id.* "However, it is settled that only 'active conduct of the conditional promisor, preventing or hindering the fulfillment of the condition' excuses nonfulfillment of the condition." *LMP Holdings v. PLY Enterprises*, No. 3:12-cv-440, 2012 WL 4344302, at *4 (E.D. Va. Sept. 21, 2012) (quoting *Parrish v. Wightman,* 34 S.E.2d 229, 232 (Va. 1945)). For this reason, the relied upon conduct must be either in breach of some duty or, at least, inequitable or unreasonable in some material respect. *See SSMC, Inc., N.V. v. Steffen*, 102 F.3d 704, 710-11 (4th Cir. 1996); Restatement (Second) of Contracts § 245 & cmt. a (1981); *see also Moore Brothers Co.*, 207 F.3d at 725 (upholding the application of the prevention doctrine where defendants actively misled lenders about the cost of a design). Here, Heritage's refusal to demonstrate its method of destruction at its own substantial expense, with no assurance of receiving the destruction work, was not improper under the circumstances. In that regard, Heritage did not breach any explicit contractual or other duty. The parties had negotiated the price at which Heritage would perform that destruction work under a subcontract from VSE, as well as what would trigger a right of rescission; and there is no evidence that the parties contemplated that Heritage

16

would incur a substantial demonstration expense as part of its contractual duty of "cooperation." In any event, ATF made the decision not to destroy all of the fireworks but only that substantially smaller portion of the fireworks that were not used for testing at the China Lake facility. The applicable Statement of Work also specified that the destruction of any fireworks would be accomplished through the use of a rotary kiln, a piece of equipment Heritage did not have, and which General Dynamics, in fact, used to destroy the fireworks not destroyed in testing. *See* Def.'s Ex. 180; Tr. 669-74.

3. Heritage had a Seventh Amendment right to a jury trial on its unjust enrichment claim.[7]

   a. The Seventh Amendment provides in relevant part: "In Suits at common law . . . the right of trial by jury shall be preserved . . . ." U.S. Const. amend. VII. The Amendment guarantees that a party in a civil case has a right to a jury trial if its cause of action is one that was cognizable in the courts of law in 1791 or is a modern-day analog to such a cause of action. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 40-41 (1989). To determine whether a right to a jury trial existed, the Supreme Court has interpreted "Suits at common law" to mean "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights *alone* were recognized, and equitable remedies were administered." *Id.* (quoting *Parsons v. Bedford*, 3 U.S. (Pet.) 433, 447 (1830)) (emphasis added).

   b. In Virginia, a claim for unjust enrichment may in substance be based on either a claim deemed "legal," such as a claim for payment of goods or services, or "equitable," such as a claim for restitution; and the action of assumpsit developed as the form of action by

---

[7] The parties agree that there is no Seventh Amendment right to a jury trial for the *quantum meruit* claim (Count II). *See* [Doc. No. 116, at 1; Doc. No. 144, at 17]. The Court therefore expresses no opinion as to whether there is a Seventh Amendment right to a jury on a claim for *quantum meruit*.

which to recover on "legal" claims based on unjust enrichment. *See In re Bay Vista of Virginia, Inc.*, No. 2:09-cv-46, 2009 WL 2900040, at *5 (E.D. Va. June 2, 2009) ("An action for unjust enrichment is the modern version of the common law action of assumpsit for money had and received . . . .") (quoting *Liebau v. Seven Oaks Limited Partnership*, No. 118066, 1991 WL 834960, at *1 (Va. Cir. Ct. May 9, 1991)); *John C. Holland Enterprises, Inc. v. J.P. Mascaro & Sons, Inc.*, 653 F. Supp. 1242, 1246 (E.D. Va.) ("The action for unjust enrichment is known in Virginia law as an action of assumpsit for money had and received.") (internal quotation marks omitted), *aff'd*, 829 F.2d 1120 (4th Cir. 1987); *Belcher v. Kirkwood*, 383 S.E.2d 729, 730 (Va. 1989) ("Although this case is now a suit in equity, Kirkwood's claims are cognizable at law, even if based on the theory of unjust enrichment."); *City of Norfolk v. Norfolk Cty.*, 91 S.E. 820, 821-22 (Va. 1917) (explaining the action of assumpsit with respect to express contract, implied contract in fact, and implied contract in law); *Eppes' Executors v. Cole*, 14 Va. 161, 167, 169 (1809); 1-12 Virginia Remedies § 12.03 (2015) (describing Virginia courts of law's development of implied contracts based on equitable principles); *id.* § 12.04 ("[A]n action on contracts implied in fact for the use of land was recognized from the earliest days of the Commonwealth.") (citing *Raven Red Ash Coal Co. v. Ball*, 39 S.E.2d 231, 233-34 (Va. 1946)); *see also Granfinanciera*, 492 U.S. at 43 ("In England, long prior to the enactment of our first Judiciary Act, common law actions of trover and [assumpsit for] money had and received were resorted to for the recovery of preferential payments by bankrupts.") (citing 18th Century English cases).

c.  Although courts often refer to unjust enrichment as a doctrine based on *equity*, there was, at the time the Seventh Amendment was ratified, a general recognition that the action of

assumpsit was premised on a *legal* obligation to pay under an implied contract. *See Kremers v. Coca-Cola Co.*, 714 F. Supp. 2d 912, 919 n.4 (S.D. Ill. 2009) ("Although unjust enrichment is spoken of commonly as 'equitable,' this is so chiefly in the sense that the doctrine is addressed to matters of fairness; historically, the roots of unjust enrichment are in law, specifically, the writ of assumpsit."); *see also Archawski v. Hanioti*, 350 U.S. 532, 534 (1956) ("Lawyers speak of the obligation in terms of indebitatus assumpsit, a concept whose tortuous development gave expression to 'the ethical character of the law.' As Mr. Justice Holmes once put it, 'An obligation to pay money generally is enforced by an action of assumpsit, and to that extent is referred to a contract, even though it be one existing only by fiction of law.'") (citations omitted); *Kern v. Freed Co.*, 299 S.E.2d 363, 364-65 (Va. 1983) ("It is true the law will imply a promise to pay for goods received. However, this implied or quasi-contract is based on equitable principles. It rests upon the doctrine that a man shall not be allowed to enrich himself unjustly at the expense of another.") (citing *American Ry. Ex. Co. v. Downing*, 111 S.E. 265, 268 (Va. 1922), and *City of Norfolk*, 91 S.E. at 821-22).

d. Heritage's unjust enrichment claim is based on an alleged failure to pay the proper amount for services and physical space provided, rather than, for example, an inherently equitable claim, such as a claim for restitution. *See, e.g.*, *U.S. ex rel. Drakeford v. Tuomey Healthcare System*, 675 F.3d 394, 403 n. 15 (4th Cir. 2012), and cases cited therein. Heritage's unjust enrichment claim would therefore fall within the category of legal claims included within the action of assumpsit at the time the Seventh Amendment was ratified.

e.  Heritage therefore had a right to a jury trial for its unjust enrichment claim under the Seventh Amendment, and the jury's verdict is therefore binding on the Court rather than advisory. *See* Fed. R. Civ. P. 39.

4.  Heritage is not precluded from recovery under the doctrine of unclean hands.

a.  The doctrine of unclean hands is an affirmative defense that prevents a party's recovery on an equitable claim if the party "has been 'guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.'" *Worldcom, Inc. v. Boyne*, 68 F. App'x 447, 451 (4th Cir. 2003) (quoting *Richards v. Musselman*, 267 S.E.2d 164, 166 n. 1 (Va. 1980)); *see Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1084 (E.D. Va. 2011) ("Unclean hands prevents a party from obtaining equitable relief because of that party's own inequitable conduct.") (citing *Brown v. Kittle*, 303 S.E.2d 864, 867 (Va. 1983)). "[A] defendant raising an unclean hands defense must demonstrate a close nexus between a party's unethical conduct and the transactions on which that party seeks relief." *Worldcom, Inc.*, 68 F. App'x at 451 (internal quotation marks omitted).

b.  The heart of VSE's unclean hands defense is that Heritage "falsified the quantity of fireworks that it stored for VSE and the United States government." [Doc. No. 144 at 13.] As stated above, when Heritage first took possession of the fireworks in 2007, the fireworks were not weighed, but were estimated, under ATF supervision, to weigh approximately 872,000 pounds, an estimate that ATF approved for billing purposes.  In September 2012, approximately 272,000 pounds of fireworks were transferred out of the Heritage storage facilities, leaving roughly 600,000 from the original estimate.  When those remaining fireworks were weighed at the time they were transferred out of

Heritage's facilities between March and August 2015, they weighed less than 400,000. Based on these figures, VSE contends that Heritage overcharged VSE and the government for some 200,000 pounds of fireworks from 2007 through August 2015 and is now barred from obtaining any relief. It also claims that Mark Vess, Heritage's President, perjured himself at trial when he testified that the discrepancy in weights was attributable to water weight that had evaporated over time and that the weights recorded in 2013 after an actual weighing reflected "net explosive weight," that is, the weight of the explosive material within the fireworks, rather than gross weight.

c. The basis for VSE's perjury claim comes principally from the testimony of Vess' ex-wife and the former President of Heritage, Bonnie Bilderback. She testified that Vess devised the overcharging scheme and told her that if he were ever caught, his excuse would be that the fireworks were wet when first obtained for storage. Much of this testimony and evidence revolved around Defendant's Exhibit 265, introduced through Bilderback, which is a Master Inventory spreadsheet prepared by Vess in 2013. The document was not produced in discovery,[8] but rather found by Bilderback in documents she had personally retained. Bilderback contacted VSE and provided a copy of the document to VSE 10 days before trial, after Vess refused her demand that he pay her $1 million in various forms of compensation in connection with their divorce proceedings. Although the jury was not instructed on the defense of unclean hands (the parties having agreed that this affirmative defense was for the Court to decide after verdict, if necessary), VSE was permitted to argue this evidence to the jury with respect to both the *quantum meruit* claim and the unjust enrichment claim, as well as Vess' credibility generally.

---

[8] VSE points to Heritage's failure to produce this document in discovery, but VSE has not shown that this document was within the scope of any of VSE's document discovery requests.

d.  Based on all the facts and circumstances, the Court finds and concludes that VSE has not

proven its affirmative defense of unclean hands.

  i.  ATF and VSE knew that the weight of the fireworks initially used for billing purposes

was based on estimates at intake.  VSE also knew that ATF had approved that

estimate for billing purpose and had instructed Heritage to use the weight at intake for

billing purposes throughout the storage process.  *See* Tr. 690-92; Def.'s Ex. 125.

Those billing instructions were never conditioned on or qualified by an actual

weighing of the fireworks, nor were they later modified or rescinded based on the

weighings on which VSE relies.  ATF approval was required for any manipulations or

weighing of the fireworks; and in fact, there is no evidence that the fireworks were

ever weighed for the purpose of Heritage's billings.

  ii.  As early as 2009, after the fireworks were "re-palletized," the storage fees appear to

have been driven, not by gross weight, but by space allocated.  The space allocated

for storage does not appear to have been falsified in any way; and when Heritage

began billing in 2011 expressly by the square foot of space allocated to the fireworks,

its storage charges increased.  By the time Defendant's Exhibit 265 had been prepared

in late 2013, when VSE claims that Vess knew the earlier weight estimate was

incorrect, Heritage had been billing for storage by the square foot, not weight, for

over 2 years at a rate, however established, that was not excessive or inflated relative

to the only identified available alternative, which would have charged on a square

foot basis nearly twice Heritage's charge.

  iii.  With respect to Vess' alleged perjury during the trial, Defendant's Exhibit 265 had

not been previously marked, admitted, or produced in the litigation, and Vess testified

22

in rebuttal shortly after VSE introduced its Exhibit 265 through Bilderback. Even were Vess' testimony inaccurate as to whether the listed weights were gross or net explosive weight, the Court cannot conclude under the circumstances that Vess provided perjured as opposed to mistaken testimony concerning his on-the-spot explanation of that document.

e.  The Court is also bound by the holding in *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962), which gives the jury's factual determinations controlling weight where those facts are necessary to both legal and equitable claims. Although the jury was not instructed explicitly on the doctrine of unclean hands, it was instructed on the elements of unjust enrichment, which includes as an element that "defendant accepted or retained the benefit under circumstances which would make it inequitable for defendant to retain the benefit without paying for its value." The jury heard the evidence pertaining to Heritage and Vess' allegedly improper conduct, as well as the testimony of Bilderback, and after assessing that evidence and the witnesses' respective credibility, awarded the damages Heritage requested based on its per square foot charge. The jury, therefore, necessarily found that under the circumstances, it would be "inequitable" for VSE not to pay Heritage's invoiced storage charges and implicitly rejected VSE's claims that Heritage and Vess were engaged in a fraudulent billing scheme. Although the Court independently finds and concludes that Heritage did not engage in inequitable conduct that was so connected to its claims as to preclude recovery under the doctrine of unclean hands, VSE's unclean hands defense is fundamentally at odds with the jury's binding verdict on Heritage's unjust enrichment claim.

5. Heritage's *quantum meruit* and unjust enrichment claims are barred by the applicable statute of limitations for the period before November 26, 2011.

   a. Under Virginia law, a three-year statute of limitations applies to plaintiff's *quantum meruit* and unjust enrichment claims.  *See* Va. Code Ann. § 8:01-246(4).  Plaintiff filed this action on February 27, 2015.  The parties entered the Tolling Agreement, under which any applicable limitations period was tolled from November 26, 2014 through March 1, 2015 [Def.'s Ex. 191].  Heritage contends that none of its claims are time-barred because (1) Heritage's obligation to provide storage services were continuing and indivisible and under the continuing undertaking doctrine, the limitations period did not begin to run until those services were complete; or alternatively, (2) the parties' Settlement Agreement tolled the statute during the time it was operative—October 24, 2013 to January 14, 2015.  For the reasons stated below, the applicable statute of limitations was not tolled based on any of these contentions; and Heritage's *quantum meruit* and unjust enrichment claims are therefore barred by the applicable statute of limitations for the period before November 26, 2011.

   b. The continuing undertaking doctrine is inapplicable.

      i. "As a general rule, the statute of limitations begins to run against a cause of action at the time of its accrual."  *Harris v. K & K Ins. Agency, Inc.*, 453 S.E.2d 284, 286 (Va. 1995) (quoting *McCormick v. Romans*, 198 S.E.2d 651, 654 (Va. 1973)).  For quasi-contract claims such as *quantum meruit* and unjust enrichment, a cause of action accrues when the money due is not paid.  *See, e.g., Lismont v. Alexander Binzel Corp.*, No. 2:12-cv-592, 2013 WL 6095461, at *13 (E.D. Va. Nov. 18, 2013) ("The unjust enrichment begins to accrue at the moment the expected

compensation is not paid.") (internal quotation marks omitted); *Belcher*, 383 S.E.2d at 731. Virginia law recognizes a limited exception to this general rule— the continuing undertaking doctrine—"with regard to a continuous or recurring course of professional services related to a particular undertaking." *Harris*, 453 S.E.2d at 286. Where this exception applies, the statute of limitations begins to run when the services for the particular undertaking end. *Id.* Virginia courts "have applied the doctrine in cases stating claims of breach of contract or negligence involving the professional services of physicians, attorneys, and accountants." *Id.* It is applicable only where the contract is *indivisible* and where the nature of the undertaking at issue requires continuing work by the service provider. *See State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F. Supp. 2d 309, 322 (E.D. Va. 2009); *Harris*, 453 S.E.2d at 286-87; *see also Hunter v. Custom Bus. Graphics*, 635 F. Supp. 2d 420, 431 n.12 (E.D. Va. 2009) (situations where the doctrine is applicable "are extremely limited").

ii.   Plaintiff argues that Virginia courts have applied the doctrine outside of the context of professional services by a physician, attorney, or accountant. For example, plaintiff points to *Allen F. Johnson & Associates v. Port Security International, LLC*, 429 F. App'x 281, 283-85 (4th Cir. 2011) (per curiam), pertaining to a consulting services agreement that was deemed indivisible, and the general pronouncements of the Supreme Court of Virginia in *Suffolk City School Board v. Conrad Bros.*, 495 S.E.2d 470, 472-73 (Va. 1998), which affirmed "the common law rule permitting a party to an indivisible executory contract to elect between pursuing his remedy when an action which would constitute a breach occurs or awaiting the time fixed by the

contract for full and final performance." These cases also note, however, "the general rule that an installment contract is considered divisible" and highlight that divisible contracts have payments due at fixed times for discrete periods. *See Allen F. Johnson & Assocs.*, 429 F. App'x at 283-84 (citing *Jones v. Morris Plan Bank,* 191 S.E. 608, 609 (Va. 1937)); *Suffolk City Sch. Bd.*, 495 S.E.2d at 473 n.4.

iii.  As an initial matter, Heritage has cited no case where the doctrine was applied to a *quantum meruit* or unjust enrichment claim, nor has the Court identified one. But Heritage's storage obligation, to the extent it is analogous to an executory contract, was "divisible," rather than "indivisible." Heritage invoiced VSE monthly for the firework storage; and payment on each month's storage was due and owing as of the date specified on the invoice. Even assuming that Heritage could not remove the fireworks from its storage without the consent of ATF, this was not a pay-by-the-undertaking job; there is no dispute that payment was due at fixed times and derived from services for discrete intervals. *See Allen F. Johnson & Assocs.*, 429 F. App'x at 284. Under these circumstances, the Court concludes that the continuing undertaking doctrine is inapplicable.

c.  The Settlement Agreement does not toll the statute of limitations.

i.  Plaintiff concedes, as it must, that the Settlement Agreement did not contain a tolling provision. In fact, after the parties entered into the Settlement Agreement, they entered into the Tolling Agreement, which specifically designated the period during which the statute of limitations was suspended—November 26, 2014 to March 1, 2015. Nevertheless, without disputing that the parties had reached a definitive agreement concerning the tolling of the applicable limitations period, plaintiff

26

contends that because it rescinded the Settlement Agreement, the Court should toll

the statute of limitations in order to "return Heritage to its legal status at the time the

Settlement Agreement was signed." [Doc. No. 145 at 11.] The Court has the ability

to toll the statute in these circumstances, Heritage contends, by virtue of its equitable

powers "to 'equitably adjust [the parties'] interests under the circumstances of the

case.'" *Id.* But Virginia courts strictly enforce statutes of limitations absent a clearly

created exception. *Casey v. Merck & Co.*, 722 S.E.2d 842, 845 (Va. 2012). "'[A]ny

doubt must be resolved in favor of the enforcement of the statute.'" *Id.* (alteration in

original) (quoting *Arrington v. Peoples Sec. Life Ins. Co.*, 458 S.E.2d 289, 291 (Va.

1995)). The Supreme Court of Virginia has also made clear that there would be few

circumstances that would allow for the equitable tolling of a statute of limitations.

*See id.* The Court concludes based on Virginia law that the statute of limitations is

not equitably tolled where, as here, the parties failed to include a tolling provision in a

settlement agreement that was rescinded. The Court therefore declines to exercise

any authority or discretion it may have to toll the applicable statute of limitations

based on the parties' Settlement Agreement.

d. VSE is not precluded from relying on a statute of limitations defense under the doctrine

of equitable estoppel.

i. Under Virginia law, to invoke equitable estoppel a party must prove "by clear,

precise, and unequivocal evidence" that (1) a "material fact was falsely represented or

concealed"; (2) the "representation or concealment was made with knowledge of the

fact"; (3) the "party to whom the representation was made was ignorant of the truth of

the matter"; (4) the "representation was made with the intention that the other party

27

should act upon it"; the "other party was induced to act upon it"; and (6) the "party claiming estoppel was misled to his injury." *Boykins Narrow Fabrics Corp. v. Weldon Roofing & Sheet Metal, Inc.*, 266 S.E.2d 887, 890 (Va. 1980). There is no evidence sufficient to establish any of these elements. Plaintiff argues that equitable estoppel does not require deceit; but even accepting that proposition,[9] plaintiff has not identified, much less proven by clear evidence, that there was a material fact that was "falsely represented or concealed." *Boykins Narrow Fabrics Corp.*, 266 S.E.2d at 890.

6. Heritage is entitled to recover on its *quantum meruit* claim, and the Court awards damages in the amount of $3,496,086.29.

   a. Under Virginia law, "'[w]here the parties contract for the doing of certain work, and the work is done and accepted, and it appears that there was a misunderstanding as to the price to be paid for it, the law rejects the understanding of each, and awards reasonable compensation.'" *Marine Dev. Corp. v. Rodak*, 300 S.E. 2d 763 (Va. 1983) (quoting *Brakenseik v. Shaffer*, 457 P.2d 511, 514-15 (Kan. 1969)). "The measure of recovery [on a *quantum meruit* claim] is the reasonable value of the services performed, and not the amount of benefit which actually accrued from them to him for whom they were performed," less "any benefit that has accrued to the plaintiff himself by reason of the work." *Hendrickson v. Meredith*, 170 S.E. 602, 605 (Va. 1933) (internal quotation marks omitted). Accordingly, in addition to establishing that the parties failed to reach an agreement on price, in order to prevail on its *quantum meruit* claim, Heritage must prove

---

[9] The Supreme Court of Virginia has "observed that with respect to the estoppel . . . which affects the title to real estate, there must be the express intention to deceive, or such careless and culpable negligence as amounts to constructive fraud." *Moorman v. Blackstock, Inc.*, 661 S.E.2d 404, 411 (Va. 2008) (internal quotation marks omitted).

that: (1) Heritage rendered valuable services to the VSE; (2) VSE requested and accepted those services; and (3) Heritage provided those service under such circumstances that VSE was reasonably notified that Heritage, in performing those service, expected to be paid by VSE. If successful, Heritage is entitled to the reasonable value of those services.[10]

b. VSE argues that Heritage had no reasonable expectation of payment beyond that which VSE had paid on a monthly basis because VSE had made clear that it did not intend to pay any more while Heritage continued to provide services. But that argument ignores that recovery based on *quantum meruit* was established by the courts precisely for circumstances such as those presented in this case, where the parties are in agreement that the services are to be provided and accepted even though the parties have not agreed on price and have made clear their respective, though conflicting, positions concerning what is an appropriate price. That remedy is particularly appropriate here, where, as the parties recognized, VSE had a contractual obligation to store the fireworks, and the fireworks could not be moved without ATF's consent. Under the circumstances of this case, there was an implied contract to pay the reasonable value of those storage services.

c. Based on the evidence presented, and the Court's factual findings, as set forth above, the Court finds in favor of Heritage on its claim for *quantum meruit*. Heritage rendered valuable services to VSE for the storage of the Covington Seizure for the period beginning October 1, 2010 through August 2015; VSE requested and accepted those services, and Heritage provided those service, under such circumstances that VSE was reasonably notified that Heritage expected to be paid by VSE beyond what VSE had, in

---

[10] The jury was instructed on these elements when the *quantum meruit* claim was submitted to it for an advisory verdict.

fact, paid, either by way of its monthly billings or through the revenue it would receive from the anticipated destruction work order. The reasonable value of Heritage's storage services is that amount invoiced to VSE based on $12.19 per square foot of storage space allocated to the Covington Seizure. The Court accordingly renders its verdict in Heritage's favor on its *quantum meruit* claim and awards damages in the amount of $3,496,086.29.[11]

d. In assessing the reasonable value of Heritage's storage services, the Court has considered the nature of those services, the availability of alternative suppliers of comparable storage services, and the cost of comparable services from other providers. In that regard, as VSE recognized, storage of the Covington Seizure was of a "highly specialized nature," that required "the utmost care," with "unique handling requirements caused by the magnitude and volatility of those fireworks." Pl.'s Ex. 3. A typical warehouse was not suitable for the Covington Seizure, which required a special facility, security, and "24 hour surveillance . . . to ensure safety of the seizure." *Id.* As VSE also recognized, Heritage maintained a state-of-the-art facility to safeguard and destroy fireworks under their care and custody. The facility provided separate bunkers for storage with an electronic security system, a secure fenced perimeter, and 24-hour armed security guards. The property is approximately 880 acres with no public access. *Id.*

e. There were also limited alternatives to Heritage's facility, and those that were available charged rates substantially higher than Heritage's. VSE had solicited quotes from other vendors to ascertain the type of billing rates that are standard in the industry for the storage of fireworks (*i.e.*, per pound, bunker, or square foot) and could not identify a

---

[11] This amount of damages is limited to the period after November 26, 2011, as Heritage's *quantum meruit* claim for the period before November 26, 2011 is also time-barred.

consistent billing method that providers used to bill for storing the type of fireworks that

constituted the Covington Seizure. Pl.'s Ex. 3. In fact, VSE had determined that the

"[o]nly other vendor identified that is capable of storing [the type of fireworks included

within the Covington Seizure] in accordance with the [ATF] SOW [charges] a rate of

$24.22 per square foot[,]" a rate nearly 100% higher than the $12.19 per square foot rate

billed to VSE by Heritage. *Id.* Based on the evidence presented, the reasonable value of

Heritage's storage services is that amount invoiced to VSE based on $12.19 per square

foot of storage space allocated to the Covington Seizure.

7.  Heritage is not entitled to prejudgment interest on its damages award.

    a.  Heritage seeks prejudgment interest on the jury's verdict dating back to October 2010.

Heritage's claim for prejudgment interest in this diversity case is governed by Virginia

law. *See, e.g., Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir.

1999); *Wells Fargo Equip. Fin., Inc. v. State Farm Fire & Cas. Co.*, 823 F. Supp. 2d 364,

366 (E.D. Va. 2011). Under Virginia law, the trial court "may provide for interest on any

principal sum awarded, or any part thereof, and fix the period at which the interest shall

commence." Va. Code Ann. § 8.01-382. An award of prejudgment interest has a

statutory minimum rate of six percent. *Id.* § 6.2-302. Whether and for what period to

grant such an award are decisions committed to the trial court's discretion. *See, e.g.,*

*Hitachi Credit Am. Corp.*, 166 F.3d at 633; *Dairyland Ins. Co. v. Douthat*, 449 S.E.2d

799, 801 (Va. 1994). A court's discretion is guided by balancing the equities of each

case—in particular, the desire to make the prevailing party whole, including

compensation for its lost ability to use the money to which it was rightfully entitled, with

the losing party's right to litigate a *bona fide* legal dispute. *Wells Fargo Equip. Fin., Inc.*,

823 F. Supp. 2d at 366-67.  However, "[g]enerally, prejudgment interest is not allowed on unliquidated damages in dispute between the parties."  *Advanced Marine Enters. v. PRC Inc.*, 501 S.E.2d 148, 160 (Va. 1998).

b. Here, there was a long standing and *bona fide* dispute regarding the amount VSE owed to Heritage for each month of its storage services.  The parties never came to an agreement with respect to those services; and the amounts claimed under theories of *quantum meruit* and unjust enrichment were unliquidated, as there was no express contract governing price.  In these circumstances, there is no entitlement to an award of prejudgment interest; and the Court concludes in its discretion that an award of prejudgment interest on Heritage's unliquidated claim that was the subject to a good faith dispute is not warranted under all the circumstances.

## CONCLUSION

For the reasons stated above, the Court finds and concludes that: (1) the Settlement Agreement was effectively cancelled and rescinded after ATF decided not to award a work order either to VSE or Heritage for the destruction of the seized fireworks that Heritage was storing; and there was, accordingly, no accord and satisfaction that barred Heritage's claims; (2) Heritage had a right to a jury trial on its claim for unjust enrichment under the Seventh Amendment and the jury's verdict is therefore binding on the Court; (3) Heritage is not barred from recovery under the doctrine of unclean hand; (4) Heritage's claims are time-barred with respect to the period before November 26, 2011, and the awarded damages on Heritage's unjust enrichment claim are accordingly reduced from $4,782,265 to $3,496,086.29; and (5) Heritage is not entitled to prejudgment interest.  The Court also finds in favor of Heritage on its *quantum meruit* claim

(Count II) and awards damages on that claim in the amount of $3,496,086.29.  Accordingly, it is hereby

ORDERED that the jury's award of damages in favor of Heritage on its unjust enrichment claim (Count III) be, and the same hereby is, reduced to $3,496,086.29; and it is further

ORDERED that the Court's verdict be, and the same here is, rendered in favor of Heritage on its *quantum meruit* claim (Count II); and Heritage be, and the same hereby is, awarded damages on its *quantum meruit* claim in the amount of $3,496,086.29; and it is further

ORDERED that Heritage's motion for prejudgment interest be, and the same hereby is, DENIED; and it is further

ORDERED that judgment be, and the same hereby is, entered in favor of Heritage and against VSE in the amount of $3,496,086.29.

The Clerk is directed to forward a copy of this Memorandum of Decision and Order to all counsel of record and to enter judgment pursuant to Federal Rule of Civil Procedure 58 in accordance with this Order.

_____ /s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
January 24, 2017

33